NOT DESIGNATED FOR PUBLICATION

No. 118,960

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

WAYNE THORPE and KEVIN THORPE,
*Appellees*,

v.

THE RYAN E. KRAFT TRUST,
*Appellant*.

MEMORANDUM OPINION

Appeal from Bourbon District Court; TERRI L. JOHNSON, judge. Opinion filed May 17, 2019.
Reversed and remanded with directions.

*Jennifer M. Hannah*, of Lathrop Gage LLP, of Kansas City, Missouri, and *Andrew J. Ricke*, of the
same firm, of Overland Park, for appellant.

*Zackery E. Reynolds*, of The Reynolds Law Firm, P.A., of Fort Scott, for appellees.

Before BUSER, P.J., POWELL, J., and STUTZMAN, S.J.

BUSER, J.:  This is a nuisance and trespass upon real property case. Wayne and
Kevin Thorpe (collectively, the Thorpes) sued the Ryan E. Kraft Trust (Trust),
contending the Trust caused increased flooding on their property by constructing a ditch
and berm. At trial, the district court ruled the Thorpes could submit to the jury their
liability theories of intentional nuisance and intentional trespass. The jury rendered a
verdict in favor of the Thorpes on both claims. After trial, the Trust renewed its motion
for judgment as a matter of law or a new trial. The district court denied the motion.

1

The Trust appeals the district court's rulings. First, the Trust contends the Thorpes failed to present sufficient evidence at trial to establish intent, causation, and damages. Second, the Trust asserts the district court erred when instructing the jury.

Upon our review, we find the Trust's appeal is meritorious because the Thorpes failed to present sufficient evidence that the Trust intended to commit the intentional torts of nuisance and trespass. Accordingly, we reverse and remand with directions to grant the Trust's motion for judgment as a matter of law.

FACTUAL AND PROCEDURAL BACKGROUND

This case concerns ditch work performed in 2011 on the Kraft Trust's property (Kraft property) and a 2013 flood that caused water to damage the Thorpes' farmland. The Thorpes are farmers and own a tract of agricultural property in Bourbon County known as the Jane Farm. The Kraft property is situated directly north of the Jane Farm. The Jane Farm consists of 52 acres of farmland. The Marmaton River borders the Jane Farm on the west and south side of the farm. At the farm's northwest border, the Marmaton River bends south and then generally travels southeast. The Jane Farm is in the Marmaton River's floodplain.

To the north, the Kraft property is bordered by Native Road. While the Kraft property's southwest corner is close to the Marmaton River, the property does not border the river. Land owned by Sunflower Farms, LLC (Sunflower)—a company owned by Carol Dengel—is directly west of the Kraft property. The Sunflower land has access to the Marmaton River.

Roger Kraft bought the Kraft property and it was surveyed in 2007. In 2011, Kraft noticed water ponding on his property by Native Road. Water runoff from about 200 acres north of the Kraft property was flowing south and running under a bridge on Native

2

Road. The ponding on the Kraft property typically lasted three or four days before drying out.

To alleviate the ponding problem, Kraft hired Neil Burkhart to perform ditch work on the property. Burkhart dug a half-mile long ditch along the west side of the Kraft property, running from the Native Road bridge to the Marmaton riverbank. The parties dispute whether an earlier version of the ditch existed before Burkhart's construction. The Thorpes assert the Trust created a new ditch and surrounding berms. On the other hand, the Trust claims that Burkhart cleared out an existing ditch that was filled with silt and other debris.

When digging the ditch, Burkhart dumped the excavated material alongside the ditch. This material formed a berm, or levee, on either side of the ditch. The berm on the east side of the ditch was more prominent than the berm on the west side. Although not level, the berms were several feet high.

In addition to the ditch and berms, Burkhart constructed an outflow for water to run from the ditch directly to the Marmaton River. The outflow was designed for water to discharge down a 30-foot length of pipe, about 30 inches in diameter, and into the river. The outflow emptied just upstream of the Jane Farm, near the farm's northwest corner. Of note, Burkhart constructed the outflow on the Sunflower land without obtaining Dengel's permission.

The Thorpes planted soybeans on the Jane Farm during the 2013 growing season. Kevin Thorpe last observed the field in June 2013 when he sprayed the crop. In July and August 2013—about two years after construction of the ditch—the Marmaton River flooded.

In October 2013, John Griffiths harvested the soybeans on the Jane Farm. At the time, Griffiths noticed that the plants closer to the Marmaton River were laid flat and covered with mud. Griffiths harvested the salvageable soybeans, but the overall yield was only 19 bushels per acre for the entire 52 acres of farmland. In addition to the damaged soybeans, the floodwater scoured the southwest portion of the Jane Farm. In particular, water had washed over the land, stripped away the topsoil, and created holes and washes. In some areas the water removed 16 inches of topsoil and left the ground "clay-ish looking."

After discovering the flood damage, Wayne Thorpe complained to the Kansas Department of Agriculture's Division of Water Resources (Division) and the United States Army Corps of Engineers (Army Corps of Engineers). The Division informed Kraft that an unpermitted channel change and floodplain fill may exist on the Kraft property. A channel change occurs when a person changes a designated stream's direction or volume. An unapproved floodplain fill is anything above 1 foot constructed in a river's floodplain without a permit. Kraft did not respond to the Division's first two letters about the unpermitted changes on the property. After the Division sent a third letter on February 21, 2014, Kraft agreed to lower the berms to less than 1 foot above the previous grade.

The Division inspected the Kraft property three times between August 2014 and December 2015. During the first inspection, Kraft said he lowered the berms to less than a foot. But the vegetation around the ditch was thick, obscuring the true height of the berms. After the inspection, the Thorpes complained that the berms had not been lowered. Inspections in December 2014 and December 2015 revealed some areas where the berms were higher than a foot. After the December 2015 inspection, Kraft received an after-the-fact permit for the placement of 2-foot berms alongside the ditch.

4

The Army Corps of Engineers also inspected the ditch and outflow. It determined that the ditch work was authorized by Nationwide Permit 41, which allows for reshaping existing drainage ditches. The Army Corps of Engineers also determined that Nationwide Permit 7 authorized the outflow construction.

On May 20, 2014, the Thorpes filed a lawsuit against the Trust for damages to the 2013 soybean crop, loss of topsoil, and devaluation of the Jane Farm caused by the threat of future flooding. The Thorpes claimed the Trust's ditch work in 2011 exacerbated flooding from the Marmaton River and increased damages to the Jane Farm. The Thorpes asserted the Trust's action "constitute[s] a trespass and nuisance." Although monetary and injunctive relief were requested in the petition, only monetary damages were sought at trial.

Following discovery, the district court filed a pretrial order. In the order, the Thorpes contended the ditch redirected drainage directly south, instead of allowing the water to flow in a southeasterly direction. The Thorpes also asserted the berm prevented flood water from spreading across the Kraft property, causing increased flooding—both in volume and velocity—onto the Jane Farm. The Thorpes sought "damages for nuisance and trespass."

On the other hand, in the pretrial order, the Trust contended the ditch and berms had no negative effect on the Thorpes' property or crops. The Trust claimed the Thorpes could not prove their claims of nuisance or trespass. In particular, they asserted the Thorpes could not prove: (1) the Trust's intent to harm Thorpes' property; (2) causation between the Trust's actions and the Thorpes' alleged damages; and (3) evidence of damages.

A four-day jury trial was held. The Thorpes presented an engineering expert—Steven Lett—who testified about the effect of the ditch work on the Jane Farm. Lett opined:

> "The levee or berm alongside in the ditch actually impacts the storm events as the water rises in flooding. Anything over about a ten-year flood or a 10 percent recurrence, there's a 10 percent chance in any one given year that . . . type of storm would occur. This levee keeps the water from spreading out over the entire width of the floodplain and actually channelizes the water in the ditch down along the levee and then when it hits the end of the ditch in flood stage, it, then, fans out, causing additional velocities and scouring of the downstream property, which is the Thorpe property."

Lett elaborated on his opinions, clarifying that a 2-year storm—or a storm with a 50% likelihood of occurring in a year—would stay within the confines of the riverbank. However, a 10-year or stronger storm would escape the Marmaton riverbank and flood the Jane Farm. When the Marmaton River flooded, the berms prevented the water from flowing onto the Kraft property. As a result, the water was forced into a small area, which caused the water's flow velocity to increase significantly on the Jane Farm.

Lett testified that "[t]he levee actually constricted the amount of area available for the water to flow and causes the flow to increase in velocity and that in my opinion is what has caused the damage to the Thorpe property." Lett specifically opined that the berm likely caused the damage to the Thorpes' soybeans and topsoil. Finally, Lett explained that the ditch redirected drainage upstream from the Jane Farm. Before the ditch work, the runoff from underneath the Native Road bridge had flowed across the Kraft property and discharged downstream of the Jane Farm. Because the drainage now discharged upstream of the Jane Farm, the ditch itself also caused elevated water levels and a slight increase in velocity during some floods.

Kevin and Wayne Thorpe testified about flooding on the Jane Farm before the ditch work in 2011. According to the Thorpes, the Marmaton River periodically floods the Jane Farm. Before the 2013 flood, however, the Marmaton River would gently back up from further downstream. The water would then backfill into the field from the south, rising and falling slowly. No floods scoured the ground or washed away the topsoil before the 2013 flood.

The Thorpes described the soil on the Jane Farm before the 2013 flood. At that time, the Jane Farm was very productive and had good soil. The farm was "bottom ground," consisting of more and deeper topsoil than other land. The Thorpes regularly fertilized the field and built up a nutrient base in the topsoil. Previously, the area affected by the flood was the most productive land on the Jane Farm.

Griffiths testified about his observations during the 2013 harvest. When Griffiths began harvesting the Jane Farm, he believed there would be a good yield. He estimated the unaffected farmland produced more than 50 bushels per acre. However, as Griffiths continued combining, he noticed the soybeans closer to the river were knocked flat and covered with mud. Griffiths notified the Thorpes about his discovery. Kevin went to the Jane Farm and observed the fallen soybean plants. He had never seen his soybean crop knocked over by prior floods. Based on comparing the farm's soybean yields before and after the 2013 flood, Kevin calculated $27,000 in crop losses.

When Kevin disked the Jane Farm after harvest, he discovered the flood removed topsoil in areas and the ground contained washes and holes. In fact, about 16 inches of topsoil had been washed out in some areas. Kevin believed the value of the lost topsoil was $50,000.

Dengel testified that she discovered the Trust's outflow pipe on her property in 2014. Dengel had not given anyone permission to construct the outflow. By the time of

7

trial, the soil under the outflow pipe had eroded, causing a large gap between the pipe and the ground. Kevin also described the erosion around the outflow pipe. He testified that since the outflow construction, the erosion on the riverbank has significantly increased causing the riverbank to cave in and trees to fall into the river. Because the riverbank has eroded by several feet, the water can reach the Jane Farm before flood stage.

Kevin testified that he buys land and is familiar with land prices around the Jane Farm. Based on his knowledge, Kevin estimated the Jane Farm would have been worth $3,500 per acre before the ditch work and 2013 flood. With the ditch, berm, and outflow pipe in place, Kevin estimated the land is now worth only $2,000 per acre.

In his own defense, Kraft testified that he hired Burkhart to clean out the existing ditch. Kraft believed Burkhart was an expert and he was confident in his ability to perform the work. The goal of the ditch work was to drain the water pooling on the Kraft Farm into the Marmaton River. When the work was performed, however, Kraft did not know the outflow pipe extended onto the Sunflower property.

Kraft testified that he did not intend to create any harmful conditions or deflect any floodwater onto neighboring properties. Moreover, he claimed to have no knowledge that the work would affect floodwater or damage the Jane Farm. On the contrary, Kraft testified that he believed the ditch work would help the neighboring land in addition to the Kraft property.

Burkhart also testified that he had no intent to harm other properties when he performed the ditch work. Instead, Burkhart believed his work improved the drainage for the entire area, including the Jane Farm. Moreover, Burkhart did not believe the ditch work had any effect on Jane Farm and, if anything, he thought it kept flood water from entering the Thorpes' farmland.

8

During trial, the Trust moved for judgment as a matter of law. The Trust contended the Thorpes failed to prove the elements of intent, causation, and damages. The district court denied the Trust's motion.

At the close of the trial evidence, the district court held an instructions conference. At this conference, a dispute arose regarding whether the Thorpes were limited to presenting an intentional nuisance claim to the jury. The district court ultimately determined that, given their contentions in the pretrial order, the Thorpes were limited to submitting claims for intentional nuisance and intentional trespass.

The jury rendered a verdict in favor of the Thorpes and awarded them $82,780 in damages. On a special and itemized verdict form, the jury determined the Trust committed both an intentional nuisance and an intentional trespass.

After the adverse verdict, the Trust renewed its motion for judgment as a matter of law or new trial. The district court denied the Trust's renewed motion finding there was sufficient evidence to prove intentional nuisance and intentional trespass, causation, and damages. The district court also found no error in the instructions submitted to the jury.

The Trust appeals.

DENIAL OF THE TRUST'S MOTION FOR JUDGMENT AS A MATTER OF LAW

On appeal, the Trust contends the district court erred by denying its motion for judgment as a matter of law because the Thorpes failed to present evidence establishing intentional conduct.

Similarly, in the district court, the Trust contended the Thorpes failed to show the necessary element of intent to prove both nuisance and trespass. The Thorpes responded,

9

in part, contending that they pled alternative theories of nuisance. They asserted that, in addition to intentional nuisance, they also made a claim for "regular ordinary nuisance." After hearing the parties' arguments, the district court denied the Trust's motion.

During the instructions conference, the Thorpes' attorney, Zackery E. Reynolds, noted, "[T]his is a nuisance case. The jury could find that there was an ordinary nuisance, or it could find that there is an intentional nuisance." The district judge interjected, "Whoa, whoa, whoa. Mr. Reynolds, you pled in your Petition intentional nuisance and intentional trespass. You didn't plead ordinary nuisance." Reynolds responded that the Thorpes pled nuisance and trespass in the pretrial order, and that they could assert alternative theories. Reynolds continued, "[E]ven in the instructions that were submitted at the time of the pretrial conference, we submitted ordinary negligence instructions."

After considering Reynolds' response, the district judge ruled:

> "I am looking at the Pretrial Order. You've got, 'Defendant's actions constitute a nuisance and a trespass.' Next paragraph, 'Defendant's actions were intentional and in reckless disregard for the plaintiffs' rights as a lower landowner.'
> "I think you're limited to 'intentional trespass' and 'intentional nuisance.'"

During this discussion, the Trust argued that the Thorpes raised only a private nuisance claim, which required proof of intentional conduct: "Mr. Reynolds has not pled an ordinary negligence case. He can't plead . . . an ordinary nuisance claim based on negligence because it's a private nuisance, which is an intentional tort."

After considering the parties' arguments, the district court ruled the Thorpes could only submit a claim for an intentional private nuisance. In particular, the district judge found that "a private nuisance is an intentional tort. I can't see, Mr. Reynolds, that there's any and/or private nuisance, anything less than intentional tort."

10

After the adverse jury verdict, the Trust renewed its motion for judgment as a matter of law or new trial. In its motion, the Trust claimed the Thorpes failed "to present any evidence of intent—an essential element of both intentional tort claims."

In a lengthy and detailed written order, the district court denied the Trust's posttrial motion. First, the district court identified the claims it allowed the jury to consider:

> "Claims plead
>
> "Plaintiffs plead two causes of action, intentional trespass and nuisance. All parties agree that trespass is an intentional tort. There continues to be disagreement between the parties on whether plaintiffs plead only intentional nuisance. Plaintiffs argue that [they] did not plead only intentional nuisance and cite[] the pretrial order as evidence of the same. The Court has reviewed the February 18, 2016 Pretrial Order and finds that there [are] no allegations of the defendant's negligent behavior in the Pretrial Order. During the course of this case, the Court has made several rulings referencing that the plaintiffs have plead intentional nuisance only. Therefore the following analysis will view the sufficiency of the evidence presented to sustain the verdict on Intentional Nuisance and [Intentional] Trespass."

Next, the district court summarized the Trust's reason for contending that the Thorpes' evidence was insufficient to submit to the jury. According to the district court:

> "As to nuisance, Defendant is not arguing that there was no interference with the use and enjoyment of the land, that the harm was not substantial, or a nature or duration that it constituted unreasonable interference with the use of the land. They are arguing that there was *no evidence presented of intent*. As to trespass, Defendant is not arguing that a foreign matter didn't enter onto the Thorpe[s'] land. Defendant is arguing that there was *no evidence that the Defendant*[] *intended the entry or the harm and that there was no evidence that the act of entry was purposeful or substantially certain to occur.*" (Emphases added.)

11

After summarizing the circumstantial evidence tending to establish the Trust's intent, the district court ruled that "[a] reasonable jury could conclude that Defendant knew that its action was substantially likely to harm the Plaintiffs' land; a lower land owner."

On appeal, the Trust argues that both nuisance and trespass—as pled by the Thorpes and submitted to the jury—required proof of intent in order to establish liability. The Trust then asserts there is no evidence to show that it purposefully harmed the Jane Farm or that it knew with substantial certainty the ditch work would harm the Thorpes' property.

In response, the Thorpes submit they were not required to prove intentional conduct as part of their nuisance claim. Alternatively, the Thorpes argue they presented sufficient evidence establishing the Trust's intent to interfere with or discharge foreign matter onto the Jane Farm, as required to prove both intentional nuisance and intentional trespass.

We begin our analysis with a brief summary of the relevant standards of review relating to Kansas district courts and appellate courts. When ruling on a motion for directed verdict, the trial court must resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When reasonable minds could reach different conclusions based on the evidence, the motion must be denied. The appellate court must apply a similar analysis when reviewing the grant or denial of a motion for judgment as a matter of law. *Siruta v. Siruta*, 301 Kan. 757, 766, 348 P.3d 549 (2015); *City of Neodesha v. BP Corporation*, 295 Kan. 298, 319, 287 P.3d 214 (2012).

The district court's decision on a motion for judgment as a matter of law is reviewed de novo determining "whether evidence existed from which a reasonable jury

'could properly find a verdict for the nonmoving party.' [Citation omitted.]" *Siruta*, 301 Kan. at 766. When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

At the outset, we address the Thorpes' argument that "[n]o evidence of intent was required for any ordinary nuisance case. . . . There was more than adequate evidence on ordinary nuisance, and this was sufficient to justify the verdict." In reply, the Trust complains that the Thorpes are impermissibly raising a new issue for our review. In particular, they argue that because the Thorpes did not cross-appeal the district court's adverse ruling that they only pled intentional negligence, our court "does not have jurisdiction to review the trial court's ruling requiring proof of intent as a necessary element of Plaintiffs' nuisance claim—a ruling that was adverse to Plaintiffs and made over their objections."

What are the essential features of a nuisance claim? As a general matter:

> "A nuisance is an annoyance, and any use of property by one which gives offense to or endangers life or health, violates the laws of decency, unreasonably pollutes the air with foul, noxious odors or smoke or obstructs the reasonable and comfortable use and enjoyment of the property of another may be said to be a nuisance." *Culwell v. Abbott Construction Co.*, 211 Kan. 359, Syl. ¶ 1, 506 P.2d 1191 (1973).

More specifically, in Kansas law there are two general types of nuisance: private nuisance and public nuisance. "A private nuisance is a tort relating to an unlawful interference with a person's use or enjoyment of his [or her] land." 211 Kan. 359, Syl. ¶ 2. A public nuisance, on the other hand, is predicated on an infringement of the rights of the community at large and affects an interest common to the general public. 211 Kan. at

13

362. The two concepts can overlap, in that a public nuisance may amount to a private nuisance when it interferes with an individual landowner's enjoyment of their land. 211 Kan. at 364. To be actionable, the nuisance must be the proximate cause of the injury and damage for which the plaintiff seeks recovery. *Baldwin v. City of Overland Park*, 205 Kan. 1, 6, 468 P.2d 168 (1970).

A private nuisance action—as was pled here—may be brought on a theory of intentional conduct, negligence, or strict liability. *Sandifer Motors, Inc. v. City of Roeland Park*, 6 Kan. App. 2d 308, 315, 628 P.2d 239 (1981). Our Supreme Court has explained that nuisance is a field of tort liability defined by a result, which may be caused by conduct of differing levels of culpability. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 46-47, 169 P.3d 1052 (2007). In *Smith*, the Supreme Court reiterated:

> "'Nuisance is a field of tort liability rather than a type of tortious conduct. Nuisance has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. Professor Prosser concludes that the attempt frequently made to distinguish between nuisance and negligence, for example, is based entirely upon a mistaken emphasis based upon what the defendant has done rather than the result which has followed, and forgets completely the well-established fact that negligence is merely one type of conduct which may give rise to a nuisance. In other words a nuisance may result from conduct which is intentional or negligent or conduct which falls within the principle of strict liability without fault. The point is that nuisance is a result and negligence is a cause and they cannot be distinguished otherwise.' [Citation omitted.]" 285 Kan. at 46-47 (quoting *Culwell*, 211 Kan. at 364).

As the Thorpes correctly assert, a private nuisance claim does not necessarily require proof of intent. In this regard, the district court incorrectly found that a private nuisance may only result from intentional conduct. That said, the district court specifically and repeatedly determined that, based on the pretrial order, the Thorpes had asserted a theory of liability based only on an intentional private nuisance.

14

Importantly, the Thorpes failed to cross-appeal the district court's adverse ruling that they brought a private nuisance claim as an intentional tort. This failure is consequential. K.S.A. 2018 Supp. 60-2103(h) requires an appellee to file a notice of cross-appeal from adverse rulings to obtain appellate review of those issues. *Lumry v. State*, 305 Kan. 545, 553-54, 385 P.3d 479 (2016). "When an appellee desires to have a review of rulings and decisions made by the district court, the appellee must file a cross-appeal; otherwise, the issue is not properly preserved." *Turner v. Kansas Dept. of Revenue*, 46 Kan. App. 2d 841, 846, 264 P.3d 1050 (2011).

The Thorpes' failure to file a cross-appeal creates a jurisdictional bar that prevents our court from reviewing the district court's adverse ruling. See *Lumry*, 305 Kan. at 555. The district court's ruling that the Thorpes were required to prove intent as part of their private nuisance claim may not be disturbed on appeal. As a result, with regard to the private nuisance claim, we will only consider whether there was sufficient trial evidence to prove the Thorpes engaged in an intentional tort.

Turning to the Thorpes' trespass claim, we first observe that this tort may also be intentional, the result of negligence, or based on strict liability when the defendant engages in an abnormally dangerous activity. *Lofland v. Sedgwick County*, 26 Kan. App. 2d 697, 699, 996 P.2d 334 (1999). Neither party, however, suggests the Thorpes engaged in negligent or abnormally dangerous conduct in committing a trespass. And as the district court concluded, at trial both parties were in agreement that the trespass claim was based on intentional conduct. As a result, the Thorpes were required to prove their claim that the trespass was intentional. See *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 729, 915 P.2d 80 (1996) ("Kansas has recognized intent is an element of a claim for non-negligent intrusion upon the land of another.").

Finally, the Thorpes' claims of intentional nuisance and intentional trespass "require proof of the same kind of intent." *Lofland*, 26 Kan. App. 2d at 699. Accordingly,

15

we will examine whether there was sufficient evidence of intent from which a reasonable jury could render a verdict for the Thorpes based on the Trust's intentional conduct which caused a trespass or private nuisance.

To support a claim of intentional trespass, a plaintiff must show the defendant was intentionally on any part of the plaintiff's land. *United Proteins*, 259 Kan. 725, Syl. ¶ 5.

> "When a claim of trespass is based on a foreign matter intruding on the plaintiff's land, the plaintiff must show that the defendant intended the foreign matter to intrude on the plaintiff's land or that the defendant performed the act with knowledge that the act would, to a substantial certainty, result in the foreign matter entering the plaintiff's land." *Muhl v. Bohi*, 37 Kan. App. 2d 225, 229-30, 152 P.3d 93 (2007).

Performing an act which will almost certainly result in foreign matter entering on another's land suffices for an intentional trespass to land, regardless of an intent to harm other property. *United Proteins*, 259 Kan. at 730. Thus, consistent with other intentional torts, trespass requires the plaintiff show an entry was either purposeful or substantially certain to occur. 259 Kan. at 730.

Similarly, like trespass, intentional nuisance requires that the defendant act with the purpose of causing the nuisance or know it is substantially certain to result from his or her conduct. 259 Kan. at 732. As our Supreme Court stated long ago:

> "'It is not enough to make an invasion intentional that the actor realizes or should realize that his conduct involves a serious risk or likelihood of causing an invasion. He must either act for the purpose of causing it or know that it is resulting or is substantially certain to result from his conduct.'" 259 Kan. at 733 (quoting Restatement [Second] of Torts § 825, comment c [1965]).

16

The Trust argues that the defendant's knowledge or purpose at the time of the underlying act determines whether the resulting invasion was intentional. See *Sandifer Motors*, 6 Kan. App. 2d at 318. The defendant's mere knowledge that an entry occurred, by itself, does not establish a claim for trespass or intentional nuisance under a theory of constructive intent. *United Proteins*, 259 Kan. 725, Syl. ¶ 6. That said, a verdict may be supported by circumstantial evidence if that evidence provides a basis for a reasonable inference by the fact-finder on the fact at issue. Circumstantial evidence, to be sufficient, need not exclude every other reasonable conclusion. *Siruta*, 301 Kan. at 767. Intent may be established through circumstantial evidence and does not need to be directly proven. *Jones v. Kansas State University*, 279 Kan. 128, 142, 106 P.3d 10 (2005).

The district court determined that, based on circumstantial evidence, a reasonable jury could conclude that by draining more than 200 acres directly above the Jane Farm and constructing a 6-foot berm, the Trust knew with substantial certainty that the project would cause additional flooding on the Thorpes' land. Moreover, the district court concluded that the "way that the ditch/berm/levee was constructed with the 30 inch [in diameter] drainage pipe, that common sense would tell them that constricting the flow of water into the 30 inch pipe increased the velocity of the water and caused the scouring of the Thorpe[s'] property." The district court also found evidence of intentional conduct by the Trust entering the Sunflower property to construct the outflow pipe and taking almost three years to comply with directives from Kansas governmental authorities.

On appeal, the Thorpes reprise the district court's reasons in support of a finding of intentional conduct. The Thorpes also remind us that "[i]ntent is rarely susceptible of direct proof" and analogize to criminal cases involving specific intent for the proposition that "[r]easoned inferences from circumstantial evidence will support a jury verdict which required proof of intent."

17

On the other hand, the Trust asserts the only circumstantial evidence relating to the ditch work counters the notion that the Trust acted with the required intent. In particular, the Trust highlights that the ditch work did not occur on the Thorpes' property, the flood damage occurred about two years after the ditch work, the Thorpes did not claim any additional flood damages in the four years after the 2013 flood, and the Thorpes' expert, Lett, testified the ditch work would not affect Jane Farm unless there was a storm event greater than a 10 year storm, and a storm of that magnitude may not happen for 20 years. As a result, the Trust concludes that there was no direct or circumstantial evidence that it acted with the purpose of intentionally causing a trespass or nuisance, or that the Trust knew that flooding was substantially certain to result from the ditch work in 2011.

Upon our review of the record, in the light most favorable to the Thorpes, we are persuaded that no reasonable jury could conclude the Trust acted with the purpose of causing the trespass or nuisance, or know it was substantially certain to result from the Trust's conduct in constructing the ditch and berm.

At the outset, the only direct testimony relating to the Trust's intent in performing the ditch work was Kraft's testimony that he did not intend to create any harmful conditions or deflect any floodwater onto neighboring properties, including the Jane Farm. Instead, Kraft testified that he believed the ditch work would help protect the Trust's property and adjoining land from floodwaters. Similarly, Burkhart also testified that he had no intent to harm other properties when he performed the ditch work. On the contrary, Burkhart thought his work improved the drainage for the nearby area, including protecting the Jane Farm from floodwater.

In the view of the district court and the Thorpes, "common sense" played an important role in establishing circumstantial evidence of the Trust's actionable intent. The district court noted the project was constructed to divert considerable floodwater into a 30-inch outflow pipe from which the court inferred the Trust had to know it would result

18

in increasing the velocity of the water and cause flooding on the Jane Farm. On the other hand, the Trust emphasizes that from the nature of the project—in particular, the fact that the ditch was designed to funnel water to the outflow pipe located on Sunflower land and directly into the Marmaton River—a reasonable jury could not conclude that the Trust intended to have water trespass onto the Jane Farm, create a nuisance on it, or know that such a consequence was substantially certain to result. We are persuaded that the Trust has the better argument.

Kansas cases support our conclusion that there was insufficient evidence of intent to sustain the jury's verdict. In *Sandifer Motors*, a landowner sued the City of Roeland Park, claiming that a nuisance maintained by the city on adjoining property caused the plaintiff's business to sustain flood damage. The plaintiff alleged the city used the adjoining property as a dump, and debris from the dump caused the landowner's drainage system to clog and burst during a heavy rain.

The *Sandifer Motors* court held there was insufficient evidence of intent to support an intentional nuisance claim. 6 Kan. App. 2d at 318-19. Although the city was aware of debris washing onto the plaintiff's land, none of the prior problems were as serious as the flooding. Our court concluded:  "[T]he city simply dumped where it should not have. There is nothing to indicate it *intended* to damage the plaintiff, or that the injury was substantially *certain* to occur. At best, the evidence showed only that the city's conduct created a *condition* posing an undue *risk* of harm." 6 Kan. App. 2d at 319.

Years later, our court came to a similar conclusion in *Lofland*. The plaintiffs in *Lofland* sued Sedgwick County after the county's sewage system failed and caused raw sewage to back up into their homes. When it designed the sewage system, the county knew sewage would back up into the plaintiffs' homes if the sewage pump and backup system failed. Yet this court rejected the argument that the county possessed the requisite intent just because the county knew the sewage system was not foolproof. Instead, the

19

*Lofland* court determined that the plaintiffs failed to present "sufficient evidence to establish that the County acted in any manner evidencing knowledge that a sewage backup would occur or that there was a substantial certainty such an event would occur." 26 Kan. App. 2d at 705.

Returning to the case on appeal, the Trust performed the ditch work to drain water accumulating on the Kraft property into the Marmaton River. The evidence of the berm shows that the Trust sought to protect its own property from flooding. Although the outflow pipe was nearby the Jane Farm, there was no evidence presented that the Trust had the purpose or intent to interfere, intrude, or otherwise exacerbate the flooding on the Jane Farm. Rather, the evidence shows a purpose to drain the water directly into the river rather than onto adjoining property.

The Thorpes assert "[a] natural consequence of erecting a ditch and levee is to block and redirect water." As a result, the Thorpes claim a reasonable person would know the ditch work would obstruct the floodplain in a way that water was substantially certain to invade the Jane Farm. The evidence that the Trust redirected drainage near the Jane Farm may indicate the Trust realized or should have realized its conduct involved a risk of causing flooding on the Jane Farm. But the critical issue in this intentional tort case is whether a reasonable jury could determine that the Trust knew the ditch work would, *to a substantial certainty*, result in increased flooding on the Jane Farm. See *United Proteins*, 259 Kan. at 733.

In contrast to the ditch work involved in this case on appeal, the intentional conduct identified in *United Proteins* involved the operation of a fertilizer plant which released chemicals that contaminated the aquifer under the property owned by United Proteins. In this regard, the present case is similar to *Sandifer Motors*, because it involves a specific incident stemming from a condition that existed for more than a year. Moreover, like the sewage system's potential to back up in *Lofland*, any knowledge by

the Trust that increased flooding may potentially occur under certain circumstances in the future does not constitute intentional tortious conduct. See *United Proteins*, 259 Kan. at 733.

The Thorpes additionally argue, as the district court concluded, that the Trust's intent to trespass and cause a nuisance was further evidenced by the trespass on the Sunflower land and the Trust's interactions with regulatory agencies. The Thorpes assert the Trust's trespass on the Sunflower land to construct the outflow pipe "shows that Defendant does not care whether it causes damage to its neighbors." And the Thorpes point to evidence that the Trust ignored the Division of Water Resources' letters and lied to the Army Corps of Engineers about an easement agreement with Dengel to maintain the outflow pipe. The Thorpes suggest this evidence shows the Trust tried to conceal its involvement and was "clear evidence of intent." We disagree.

The trespass on the Sunflower land and any misbehavior with regulatory agencies evidences no intent to increase flooding on the Jane Farm. Assuming the trespass was known to the Trust, it may suggest the Trust was willing to violate neighboring landowners' property rights to drain excess water from the Kraft property. That said, the unauthorized construction of the outflow pipe does not show that the Trust intended foreign matter to intrude on the Jane Farm. In fact, the outflow pipe was pointed away from the Jane Farm. Moreover, the Trust's communications with governmental agencies after the 2013 flood does not reveal the Trust's purpose, knowledge, or intent when constructing the ditch in 2011. See 6 Kan. App. 2d at 317-18.

In conclusion, while the evidence may show the Trust's ditch project created an undue risk of harm, this is insufficient to prove intentional nuisance and trespass, "which limits liability to egregious circumstances." *Lofland*, 26 Kan. App. 2d at 705. Even in a light most favorable to the Thorpes, we hold there was insufficient evidence to support a finding of intent on the Thorpes' tort claims. Because the Thorpes failed to prove an

21

element of their claims, the district court erred by denying the Trust's motion for judgment as a matter of law.

Given our holding, we decline to address the additional grounds raised by the Trust on appeal which, it argues, also support its motion for judgment as a matter of law or new trial.

Reversed and remanded with directions to grant the Trust's motion for judgment as a matter of law.